UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONNECTICUT MUNICIPAL ELECTRIC ENERGY COOPERATIVE,<br>　　　*Plaintiff*,<br>　　　　　*v.*<br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,<br><br>　　　*Defendant.* | Civil No. 3:19cv839 (JBA)<br><br>September 14, 2021 |

**RULING ON MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO PRECLUDE EXPERT TESTIMONY**

Plaintiff Connecticut Municipal Energy Cooperative ("CMEEC") brings this action against Defendant National Union Fire Insurance Company of Pittsburgh, PA ("National Union") for declaratory relief and damages in conjunction with National Union's allegedly improper denial of coverage under the Not-for-Profit Risk Protector insurance policy that National Union issued to CMEEC. (Am. Compl. [Doc. # 32].)

Each party has filed a Motion for Summary Judgment and a Motion to Preclude Expert Testimony. (*See* Pl.'s Mot. for Partial Summ. J. [Doc. # 61]; Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.'s Mot. for Summ. J. ("Def.'s Mot. for Summ. J.") [Doc. # 78]; Pl.'s Mot. to Exclude Testimony of Def.'s Proposed Expert, David Paige ("Pl.'s Mot. to Exclude") [Doc. # 81]; Def.'s Mot. to Preclude Expert Testimony of Pl.'s Expert James Bergenn ("Def.'s Mot. to Exclude") [Docs. ## 85, 87].)[1] The Court heard oral argument on these motions on August 31, 2021. (*See* Min. Entry [Doc. # 147].)

For the reasons stated below, the Court (1) grants in part and denies in part CMEEC's Motion for Partial Summary Judgment, (2) grants in part and denies in part National Union's

---

[1] In compliance with D. Conn L. Civ. R. 5(e)(4)(a), National Union filed two versions of its Motion to Preclude, one redacted [Doc. # 85], and the other unredacted and filed under seal [Doc. # 87].

Motion for Summary Judgment, (3) grants in part and denies in part CMEEC's Motion to Preclude, and (4) grants National Union's Motion to Preclude.

## I.  Background

### A.  The Parties

CMEEC is a state-charted municipal entity whose member organizations are the municipal electric utilities providers for multiple cities and boroughs in Connecticut. (Def.'s Local R. 56(a)(2) Statement of Facts in Opp'n to Pl.'s Mot. For Summ. J. ("Def.'s 56(a)(2) Stmt.") [Doc. # 70-1] ¶ 2.)[2] CMEEC is a political subdivision of the State of Connecticut, pursuant to sections 7-233a and 7-233e of the Connecticut General Statutes. (*Id.* ¶ 3.) CMEEC "operates as a nonprofit entity with a principal place of business in Norwich, Connecticut," and the members of CMEEC's Board of Directors are "individual representatives appointed by its member utilities and from the legislative bodies of its member utilities." (*Id.* ¶¶ 4-5.)

National Union, a Pennsylvania corporation with its principal place of business in New York, "writes and issues insurance policies in Connecticut pursuant to a license issued by the Connecticut Insurance Department." (*Id.* ¶¶ 6, 8.) National Union issued a "Not-For-Profit-Risk Protector insurance policy" to CMEEC. (*Id.* ¶ 9; Ex. A, Pl.'s Local R. 56(a)(1) Statement of Undisputed Material Facts ("the Policy") [Doc. # 61-2].) CMEEC timely paid the premiums for the Policy. (Def.'s R. 56(a)(2) Stmt. ¶ 12.)

### B.  The Policy

The Policy includes a section entitled: "Directors, Officers And Not-For-Profit Organization Liability Coverage Section One"—abbreviated within the Policy as the "D&O

---

[2] The Court cites to National Union's Local Rule 56(a)(2) Statement because it reproduces CMEEC's Rule 56(a)(1) Statement and indicates which aspects of that Statement are admitted by National Union. While the parties have also submitted Local Rule 56(a) Statements in conjunction with National Union's Motion for Summary Judgment, the Court does not include a second set of citations to these undisputed facts.

Coverage Section." (Policy at 29.)[3] The "Coverage B: Organization Indemnification Reimbursement Insurance" subsection of the D&O Coverage Section states:

> This policy shall pay on behalf the **Organization**[4] **Loss** arising from a **Claim** first made against an **Individual Insured** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy for any actual or alleged **Wrongful Act** of such **Individual Insured**, but only when and to the extent that the **Organization** has indemnified such **Individual Insured** for such **Loss** pursuant to law, common or statutory, or contract, or the Charter or By-laws of the **Organization**, duly effective under such law which determines and defines such rights of indemnity. The **Insurer** shall, in accordance with and subject to Clause 5[5] of this **Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

(*Id.*)

> The "Coverage C: Organization Entity Coverage" subsection of the D&O Coverage Section states:

> This policy shall pay on behalf of the **Organization Loss** arising from a **Claim** first made against the **Organization** during the **Policy Period** or the **Discovery Period** (if applicable) and reported to the **Insurer** pursuant to the terms of this policy for any actual or alleged **Wrongful Act** of the **Organization**. The **Insurer** shall, in accordance with and subject to Clause 5 of this **Coverage Section**, advance **Defense Costs** of such **Claim** prior to its final disposition.

(*Id.*)

The "Definitions" subsection of the D&O Coverage Section defines the term "Claim" as:

> (1) a written demand for monetary, non-monetary or injunctive relief (including any request to toll or waive any statute of limitations); or

> (2) a civil, criminal, regulatory or administrative proceeding for monetary, non-monetary or injunctive relief which is commenced by:

>> (i) service of a complaint or similar pleading;

---

[3] The Court uses the pagination generated by the court's electronic filing system when citing to pages of the Policy.

[4] The Policy uses bold font for defined terms.

[5] *See infra* pp. 4-5.

(ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or

(iii) receipt or filing of a notice of charges.

(*Id*. at 30.)

The "Definitions" subsection contains multiple definitions for the term "Wrongful Act," including:

(1) with respect to **Individual Insureds**, any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Insureds** in his/her respective capacities as such, or any matter claimed against such **Individual Insured** solely by reason of his/her status as an **Individual Insured** of the **Organization**;

(2) with respect to the **Organization** under Coverage C [Organization Entity Coverage], any breach of duty, neglect, error, misstatement, misleading statement, omission or act by or on behalf of the Organization.

(*Id*. at 3.)

The D&O Coverage Section's Clause 5 governs "Defense Costs, Settlements, [and] Judgments (Including the Advancement of Defense Costs)." (*Id*. at 32.) Clause 5 states, in pertinent part:

The **Insurer** does not assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them.

Notwithstanding the foregoing, the **Insureds** shall have the right to tender the defense of any **Claim** to the **Insurer**, which right shall be exercised in writing by the **Named Organization** on behalf of all **Insureds** to the **Insurer** pursuant to the notice provisions of Clause 7 of the General Terms and Conditions. . . .

When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 5, the **Insurer** shall advance nevertheless, excess of any applicable retention amount and at the written request of the **Insured**, **Defense Costs** prior to the final disposition of a **Claim**. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured** or **Organization**, severally according to their respective interests, in the event and to the extent that each and every **Insured** or **Organization** shall not be entitled under the terms and conditions of this policy to payment of such **Loss**.

**The Insureds shall not admit or assume liability, enter into any settlement agreement, stipulate any judgment or incur any Defense Costs without the prior written consent of the Insurer. Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer, when it has not assumed the defense of a Claim pursuant to this Clause 5, shall be entitled to effectively associate in the defense, the prosecution and the negotiation of any settlement of any Claim that involves or appears reasonably likely to involve the Insurer; and provided further that in all events the Insurer may withhold consent to any settlement, stipulated judgment or Defense Costs, or any portion thereof, to the extent such Loss is not covered under the terms of this policy.**

(*Id.* at 33-34.)

The Policy also lists several endorsements, including Endorsement #8 (the "Commissions Exclusion"). (*Id.* at 70.) The Commissions Exclusion states:

COMMISSIONS EXCLUSION
        (ALL COVERAGE SECTIONS)

In consideration of the premium charged, it is hereby understood and agreed that, with respect to all Coverage Sections, the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon, or attributable to:

(i) payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time domestic or foreign government or armed services officials, agents, representatives, employees or any members of their family or any entity with which they are affiliated; or

(ii) payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time officials, directors, agents, partners, representatives, principal shareholders, or owners or employees or "affiliates" (as that term is defined in The Securities Exchange Act of 1934, including any officers, directors, agents, owners, partners, representatives, principal shareholders or employees of such affiliates) of any customers of the **Organization** or any members of their family or any entity with which they are affiliated; or

(iii) political contributions, whether domestic or foreign.

(*Id.*)

## C. Undisputed Facts

The backdrop for the parties' dispute began on October 26, 2016, when the United States Attorney's Office for the District of Connecticut issued a federal grand jury subpoena to CMEEC (the "2016 Subpoena.")[6] (Def.'s R. 56(a)(2) Stmt. ¶ 14.) The subpoena directed CMEEC to "provide any and all documentation associated with personnel from your company who attended the annual retreats in Kentucky and West Virginia during 2013, 2014, 2015, and 2016." (Def.'s R. 56(a)(2) Stmt. ¶ 14; Ex. B-2, Pl.'s R. 56(a)(1) Stmt. ("2016 Subpoena") [Doc. # 61-3 at 15-19] at 17.) The 2016 Subpoena was accompanied by a letter, stating that "[t]he subpoena commands the production of records described in the attachment," and that "[the] subpoena has been issued as part of a federal grand jury investigation into the possible commission of a felony." (*Id.* at 18.) In addition, the 2016 Subpoena advised CMEEC that completion of an enclosed "Certificate of Records" would "significantly reduce the chances that you will be called as a witness at any future trial at which these documents might be offered as evidence." (*Id.*) CMEEC retained counsel to assist CMEEC with its response to the 2016 Subpoena. (Def.'s R. 56(a)(2) Stmt. ¶ 17.) On December 22, 2016, National Union informed CMEEC that it was denying coverage for any losses in connection with the 2016 Subpoena, as the subpoena was not a "Claim" under the Policy. (*Id.* ¶ 33.)

On March 1, 2017, the U.S. Attorney's Office for the District of Connecticut issued a second federal grand jury subpoena to CMEEC (the "2017 Subpoena"). (Def.'s R. 56(a)(2) Stmt. ¶ 35.) The subpoena directed CMEEC to "provide any and all documentation associated

---

[6] As an exhibit to its Statement of Facts, CMEEC included ethics complaints received by the Norwich Ethics Commission, which allege misconduct on the part of two members of CMEEC's Board of Directors. (See Def.'s R. 56(a)(2) Stmt. ¶ 14; Ex. B-1, Pl.'s R. 56(a)(1) Stmt. ("Ethics Complaints") [Doc. # 61-3] at 8-14.) Since CMEEC's Amended Complaint does not reference these ethics complaints or allege any injury resulting from them, they are not relevant to CMEEC's legal claims against National Union in this case. At oral argument, Plaintiff confirmed that the ethics complaints are only offered as parol evidence.

with" various aspects of CMEEC's operations, including a "[l]ist of all CMEEC Board members," "bylaws and operating procedures that govern the activity of CMEEC Board Members," "[a]ll documentation and accounting associated with CMEEC Board Member expenses," "[a]ccounting of all payments and/or reimbursements made to CMEEC Board Members during the time period specified," "[a]ccounting of CMEEC revenues from sales of utilities and services to nonmember utilities during the time period specified," and various other materials. (Def.'s R. 56(a)(2) Stmt. ¶ 14; Ex. B-3, Pl.'s R. 56(a)(1) Stmt. ("2017 Subpoena") [Doc. # 61-3 at 20-26] at 23-24.)

Like the 2016 Subpoena, a letter accompanying the 2017 Subpoena stated that "[t]he subpoena commands the production of records described in the attachment," that "[t]his subpoena has been issued as part of a federal grand jury investigation into the possible commission of a felony," and that completion of an enclosed "Certificate of Records" would "significantly reduce the chances that you will be called as a witness at any future trial at which these documents might be offered as evidence." (*Id.* at 25.) In a letter dated April 12, 2017, National Union told CMEEC that National Union was denying coverage for any alleged losses in connection with both the 2016 Subpoena and the 2017 Subpoena, on the ground that neither subpoena was a "Claim" under the Policy. (Def.'s R. 56(a)(2) Stmt. ¶ 41.)

The federal grand jury returned two indictments on November 18, 2018. (*Id.* ¶ 45.) The indicted individuals were all officers or directors of CMEEC during the period of the alleged criminal acts. (*Id.* ¶ 46.) One indictment ("Indictment 1") was against Drew Rankin ("Rankin") and James Sullivan ("Sullivan"), and the second indictment ("Indictment 2") was against Rankin, Sullivan, John Bilda ("Bilda"), Edward DeMuzzio ("DeMuzzio"), and Edward Pryor ("Pryor"). (*Id.* ¶45.)

Indictment 1 alleged that Rankin and Sullivan conspired "to conduct the business and affairs of CMEEC for their personal, pecuniary and financial benefit." (Ex. B-4, Pl.'s R. 56(a)(1) Stmt. ("Indictment 1") [Doc. # 61-3 at 27-41] ¶ 14.) The indictment identified Rankin as the

Chief Executive Officer of CMEEC and alleged that he was "responsible for the planning, operations, and administrative affairs of CMEEC." (*Id.* ¶ 9.) It identified Sullivan as "a City of Norwich representative and the chairperson of the CMEEC Board of Directors" and alleged that Sullivan served on "the compensation committee, which was responsible for determining the compensation of RANKIN [in his capacity] as CMEEC's chief executive officer." (*Id.* ¶¶ 10-11.)

According to Indictment 1, "SULLIVAN submitted his personal expenses on a regular basis via 'expense reports' which RANKIN approved and directed to be paid out of CMEEC funds." (*Id.* ¶ 18.) Indictment 1 included a table listing airfare and other travel expenses that Rankin and Sullivan allegedly caused to be paid from CMEEC's funds. (*Id.* ¶ 21.) Indictment 1 alleged that "RANKIN and SULLIVAN did not seek the approval of the CMEEC Board of Directors for SULLIVAN's personal expenses." (*Id.* ¶ 17.)

Indictment 1 charged Rankin and Sullivan with one count of Conspiracy, in violation of 18 U.S.C. § 371, and three counts of Theft concerning a Program Receiving Federal Funds (each count pertaining to a different time period), in violation of 18 U.S.C. § 666(a)(1)(A). (*See id.* at 1, ¶¶ 13-28.) Section 666(a)(1)(A) makes it a federal crime for any person who is an "agent of an organization" that receives more than $10,000 pursuant to a federal program to "embezzle[], steal[], obtain[] by fraud, or otherwise without authority knowingly convert[] to the use of any person other than the rightful owner or intentionally misappl[y], property" that is worth over $5,000 and belongs to such an organization. 18 U.S.C. § 666(a)(1)(A).

Indictment 2 alleged that Rankin, Sullivan, Bilda, DeMuzzio, and Pryor conspired "to conduct the business and affairs of CMEEC for their personal, pecuniary and financial benefit, and for the personal, pecuniary and financial benefit of their family members, friends and associates." (Ex. B-5, Pl.'s R. 56(a)(1) Stmt. ("Indictment 2") [Doc. # 61-3 at 42-62] ¶ 14.) Indictment 2 identified Bilda as "a City of Norwich representative on the CMEEC Board of Directors and an employee of the City of Norwich," DeMuzzio as "a City of Groton

representative and the Sec. of the CMEEC Board of Directors," and Pryor as "the Chief Financial Officer of CMEEC." (*Id.* ¶¶ 11-12, 14.) Indictment 2 alleged that Bilda and DeMuzzio, like Sullivan, were members of the compensation committee responsible for determining Rankin's compensation. (*Id.* ¶ 13.)

Indictment 2 alleged that "the co-conspirators planned, organized and directed lavish trips" that "did not relate to CMEEC business" but which were paid for using CMEEC funds. (*Id.* ¶¶ 19-20.) These trips allegedly included visits "to the Kentucky Derby in Louisville, Kentucky, and to a luxury golf resort in West Virginia," and "[c]osts for the trips included travel expenses, private chartered airfare, first-class hotel accommodations, meals, tickets to sporting events, golf fees, souvenirs and gifts." (*Id.* ¶ 19.) Based on these and other allegations, Indictment 2 charged Rankin, Sullivan, Bilda, DeMuzzio, and Pryor with one count of Conspiracy, in violation of 18 U.S.C. § 371, and three counts of Theft concerning a Program Receiving Federal Funds (each count pertaining to a different time period), in violation of 18 U.S.C. § 666(a)(1)(A). (*See id.* at 1, ¶¶ 16-57.)

On November 13, 2018, CMEEC submitted copies of Indictment 1 and Indictment 2 to National Union and requested advance payment of legal fees and expenses stemming from the defense of the indicted individuals. (Def.'s R. 56(a)(2) Stmt. ¶ 52.) National Union denied coverage for these costs on the ground that the Commissions Exclusion applied. (*Id.* ¶ 53.)

On January 16, 2019, Pryor filed a federal action against CMEEC, claiming that CMEEC withheld advance payment of legal fees and expenses relating to his criminal case, in violation of provisions of CMEEC's bylaws requiring advance payment of such costs. (Ex. B-7, Pl.'s R. 56(a)(1) Stmt. ("Pryor Action") [Doc. # 61-3 at 65-117] at 68- 76.) CMEEC submitted this complaint to National Union, seeking to secure coverage for CMEEC's defense costs. (Def.'s R. 56(a)(2) Stmt. ¶ 68.) National Union denied CMEEC's claim for coverage in connection with Pryor's lawsuit. (*Id.* ¶ 69.)

The criminal cases against the individual CMEEC directors and officers are ongoing. Jury selection in the first case, against the larger group of defendants, is scheduled to begin in late October 2021. *See United States v. Drew Rankin et al.*, Case No. 3:18-CR-272 (JAM), Order, ECF. No. 277. Jury selection in the second case, against only Rankin and Sullivan, is continued until after trial concludes in the first case. *See United States v. Drew Rankin et al.*, Case No. 3:18-CR-273 (JAM), Order, ECF. No. 108.

### D. Procedural History

CMEEC filed its Complaint in this case on May 31, 2019. (Compl. [Doc. # 1].) On January 17, 2020, Judge Janet C. Hall dismissed Counts Three and Four of the Complaint, which asserted a claim under the Connecticut Unfair Trade Practices Act and a breach of the duty to act in good faith, respectively. (Ruling [Doc. # 31].) CMEEC filed an Amended Complaint on February 7, 2020 (*see* Am. Comp.), and Judge Hall, again, dismissed Count Three—which reasserted CMEEC's claim for a breach of the duty to act in good faith. (Ruling [Doc. # 57].)

CMEEC's Amended Complaint, without Count Three, is operative in this matter. Count One asserts a claim for breach of contract, on the ground that National Union violated the Policy by denying CMEEC's request for advance payment of defense costs incurred by CMEEC in its responses to the 2016 and 2017 Subpoenas. (Am. Compl. ¶¶ 1-26.) Count Two asserts a claim for breach of contract on the ground that National Union violated the Policy by denying CMEEC's request for reimbursement of costs in connection with CMEEC's indemnification of its individual directors and officers following the issuance of the Indictments. (*Id.* ¶¶ 40-48.) Count Four seeks declaratory relief relating to future advancement of legal fees in connection with CMEEC's indemnification of its individual directors and officers. (*Id.* ¶¶ 102-09.) Count Five asserts a claim for breach of contract, on the ground that National Union violated the Policy when it denied CMEEC's request for costs incurred in connection with its defense against the civil action filed by Pryor. (*Id.* ¶¶ 115-

19.) Count Six seeks declaratory relief for future advancement of legal fees in connection with the Pryor action. (*Id.* ¶¶ 139-40.)

On October 28, 2020, CMEEC filed a Motion for Partial Summary Judgment on all of its remaining claims. (Pl.'s Mot. for Partial Summ. J. at 1.) National Union filed its own Motion for Summary Judgment on February 24, 2021. At the heart of these motions is (1) whether the losses responding to the grand jury subpoenas are covered under the Policy and (2) whether the Commissions Exclusion excludes coverage for all of CMEEC's claims.

On February 24, 2021, both parties moved to exclude the expert testimony of one another's attorneys' fees experts. (Pl.'s Mot. to Preclude; Def.'s Mot. to Preclude.) CMEEC moved to preclude the testimony of National Union's proposed expert, David Paige, arguing that "Mr. Paige is not qualified to offer his opinions; his methodology is unreliable; and his opinions are purely subjective and speculative." (Pl.'s Mot. to Preclude at 1.) National Union moves to exclude the testimony of CMEEC's proposed expert, James Bergenn, contending that "[t]he absence of verifiable evidence to support Mr. Bergenn's opinions, and the unreliable and subjective approach he used to reach them, which is not based upon a methodology recognized by any courts, renders his opinions nothing more than speculation." (Def.'s Mot. to Preclude at 2.)

## II.  Standard of Review

Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona* Coll., 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted). "The substantive law governing the case will identify those facts that are

material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

When, as here, the parties cross-move for summary judgment, the Court is not required to grant judgment as a matter of law for either party. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993) (citing *Schwabenbauer v. Board of Educ. of Olean*, 667 F.2d 305, 313 (2d Cir.1981)). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer*, 667 F.2d at 314.

## III. Discussion

Both parties' Motions for Summary Judgment center on the language of their insurance contract. When a contract's language is at issue, a court must determine "whether the relevant language was plain and unambiguous." *Cruz v. Visual Perceptions, LLC*, 311 Conn. 93, 101 (2014). The parties agree that the Court should interpret the Policy under Connecticut law. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. For Summ. J. ("Pl.'s Opp'n") [Doc. # 103] at 13.) Under Connecticut law, "[i]t is a basic principle of insurance law that the language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters." *R.T. Vanderbilt Co., Inc. v. Cont'l Cas. Co.*, 273 Conn. 448, 462-63 (2005). As such, "the policyholders' expectations should be protected as long as they are objectively reasonable from the layman's point of view." *Id.* at 463.

### A. Duty to Defend

Plaintiff maintains that Defendant has a duty in this case that is equivalent to the duty to defend an insured. The D&O Policy provides, in relevant part, that "[t]he **Insurer** does not

assume any duty to defend. The **Insureds** shall defend and contest any **Claim** made against them." (Policy at 33.) Nevertheless, the insured has the "right to tender the defense of any **Claim** to the **Insurer**," and if the insured complies with the requirements of the contract, "the **Insurer** shall be obligated to assume the defense of the **Claim**, even if such **Claim** is groundless, false, or fraudulent." (*Id.*) Clause 5 of the contract also provides for the advance payment of defense costs, where the insurer does not assume the defense of the claim:

> When the **Insurer** has not assumed the defense of a **Claim** pursuant to this Clause 5, the **Insurer** shall advance nevertheless, excess of any applicable retention amount and at the written request of the **Insured**, **Defense Costs** prior to the final disposition of a **Claim**. Such advanced payments by the **Insurer** shall be repaid to the **Insurer** by each and every **Insured** or **Organization**, severally according to their respective interests, in the event and to the extent that each and every **Insured** or **Organization** shall not be entitled under the terms and conditions of this policy to payment of such **Loss**.
>
> **The Insureds shall not** . . . **incur any Defense Costs without the prior written consent of the Insurer. Only those** . . . **Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that** . . . **in all events the Insurer may withhold consent to any** . . . **Defense Costs, or any portion thereof, to the extent such Loss is not covered under the terms of this policy.**

(*Id.*)

> "Defense costs" are defined as:
>
> [R]easonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against the **Insureds**, but excluding compensation of **Individual Insureds**. **Defense Costs** shall not include any fees, costs or expenses incurred prior to the time that a **Claim** is first made against an **Insured**.

(*Id.* at 12.)

CMEEC argues that the language in Clause 5 of the D&O Coverage Section triggers a "duty to advance defense costs [] equivalent to a duty to defend." (Pl.'s Opp'n at 17.) National

Union responds that "the Policy only obligates National Union to indemnify CMEEC for its payment of Defense Costs for a *covered* claim." (Def.'s Reply in Supp. Of Mot. For Summ. J. ("Def.'s Reply") [Doc. # 112] at 9.)

The "duty to defend derives from the insurer's contract with the insured." *Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co.*, 247 Conn. 457, 467 (2005). An insurer can disclaim or limit the duty to defend. *See, e.g.*, *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 796 (2013) (acknowledging that the insurer "will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance contract does not apply"); *Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 457-58 (D. Conn. 2010) (determining that under Connecticut law and through the parties' contract, the insurance company did not have a duty to defend an intentional act). If there is a duty to defend, a court need only consider "whether there was a *possibility* of coverage that triggered the insurer's duty to defend." *Nash St., LLC v. Main St. Am. Assurance Co.*, 337 Conn. 1, 8-9 (2020). (emphasis added). An insurer's "duty to defend [an insured against a lawsuit] is broader than the duty to indemnify" and "[a]n insurer's duty to defend is triggered if at least one allegation of the complaint falls even possibly within the coverage." *Id.* at 9 (quoting *Travelers Cas. & Sur. Co. of Am. v. Netherlands Ins. Co*., 312 Conn. 714, 739 (2014)).

Connecticut courts have not addressed whether the duty to advance defense costs is equivalent to the duty to defend. Plaintiff's referenced cases to support its equivalence argument do not provide the guidance it claims. The primary case does not include discussion of any such equivalence of duty. *See Associated Cmty. Bancorp., Inc. v. The Travelers Cos., Inc.*, No. 3:09-CV-1357 (JCH), 2010 WL 1416842, at *3 (D. Conn. Apr. 8, 2010). In that case, "defendants were required to advance defense costs, but did not have a duty to defend." *Id.* The duties were analyzed as equivalents because "*both parties agree*[d] that the duty to advance defense costs is analyzed under the same standard as that for a duty to defend." *Id.* (emphasis added). CMEEC's other cases discuss these duties as equivalents, but do not

address the impact of a contract provision that disavows a duty to defend. *See e.g.*, *Beazley Ins. Co., Inc. v. ACE Am. Ins. Co*., 197 F. Supp. 3d 616, 631 n.22 (S.D.N.Y. 2016) (stating that while the defendants only had a duty to advance defense costs under the parties' D&O policies, "there is no relevant difference between the allegations that insurer's duty to defend and the allegations that trigger an insurer's obligation to pay defense expenses." (citations omitted)); *Fed. Ins. Co. v. Sammons Fin. Grp., Inc.*, 595 F. Supp. 2d 962, 966-67, 976-77 (S.D. Iowa 2009) ("Where the occasion has arisen, state courts generally have viewed an insurer's duty to advance defense costs as an obligation congruent to the insurer's duty to defend . . ."); *Acacia Rsch. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, Pa., No. 05-CV-501 (PSG), 2008 WL 4179206, at *11 (C.D. Cal. Feb. 8, 2008) (finding that "in this case, the duty to advance defense costs is as broad as the duty to defend"); *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 459, 464 (S.D.N.Y. 2005) ("There is no reasoned basis in law for the distinction advanced by Continental between a duty to defend and to pay defense costs, and absolutely no basis in the National Union policy language."); *Fed. Ins. Co. v. Kozlowski*, 18 A.D.3d 33, 40-41 (N.Y. App. Div. 2005) ("[T]he same allegations that trigger a duty to defend trigger an obligation to pay defense costs." (citations omitted)).

Two cases cited by CMEEC discuss the scope of a duty to advance defense costs in conjunction with a disclaimer of the duty to defend: *Brown v. American International Group*, 339 F. Supp. 2d 336 (D. Mass. 2004) and *Lowy v. Travelers Property & Casualty Co*., No. 99-CV-2727 (MBM), 2000 WL 526702 (S.D.N.Y. May 2, 2000). In *Brown v. American International Group*, 339 F. Supp. 2d 336 (D. Mass. 2004), the district court considered virtually identical contract language, including a disclaimer of the duty to defend, in a contract dispute involving National Union. There, the court, applying Kentucky law, rejected the plaintiff's argument that National Union's duty to advance costs was an "absolute duty." *Id.* at 345-46. Instead, the court appeared to conclude that the language of the policy—allowing for the advance of defense costs in one paragraph and limiting the advance of these costs to National

15

Union's consent in another—was ambiguous, *see id.* at 344 ("the Court . . . must reconcile these apparently contradictory paragraphs"), and adopted the standard urged by National Union: "that it assumes a duty to advance defense costs only if the claim suggests a 'reasonable potential for coverage,'" *id.* at 346. The court reasoned that this interpretation "better accommodate[d]" the provisions of the policy at issue obligating National Union to advance defense costs, requiring National Union to consent to requests for such payments, and prohibiting National Union from unreasonably withholding such payments. *Id.* In making this determination, the court offered that, "[h]istorically, directors' and officers' liability policies have not imposed a duty to defend," and instead "typically impose a 'duty to pay'—that is to advance or reimburse defense costs." *Id.* at 344-45 (citing Joseph P. Monteleone & Nicholas J Conca, *Directors & Officers Indemnification and Liability Insurance*, 51 Bus. L. 573, 593 (1996)). This allows insurers to "'reimpose' control over costs, [] through consent provisions, which limit covered losses to defense costs incurred with the insurer's consent." *Id.*

In the second case, *Lowy v. Travelers Property & Casualty Co.*, No. 99-CV-2727 (MBM), 2000 WL 526702 (S.D.N.Y. May 2, 2000), the district court observed, while determining that the insurance company did not owe a duty to defend the insured, that the parties' insurance policy had a section entitled "no duty to defend." *Id.* at 2. The court also considered whether the insurance company had a duty to advance defense costs, and noted that under New York law, "there is no relevant difference between the allegations that trigger an insurer's duty to defend and the allegations that trigger an insurer's obligation to pay defense expenses." *Id.* at *2 n.1. The court, however, did not address any impact that the disclaimer of a duty to defend had on the equivalency of the two duties, which is the issue presented in this case. *See id.* at *2-3.

National Union argues that it must only indemnify CMEEC for the defense of a covered claim, (Def.'s Reply at 9), citing in support *Petersen v. Columbia Cas. Co.*, No. 12-CV-183 (JVS),

2012 WL 5316352 (C.D. Cal. Oct. 17, 2014), applying California law, and holding that the appropriate standard applicable to an insurance contract that expressly disclaims any duty to defend while also obligating an insurer to advance certain defense costs is whether "the underlying claims are within the basic scope of coverage." *Id.* at *10 (quoting *Jeff Tracy, Inc. v. U.S. Specialty Ins. Co.*, 636 F. Supp. 2d 995, 1003 (C.D. Cal. 2009)). The court in *Petersen* concluded that because of the "explicit disclaimer of any duty to defend," the "possibility of coverage" standard under the duty to defend was inapplicable to the insurer's duty to advance defense costs. *Id.* at *8-10

The Court disagrees with Plaintiff's interpretation of the scope of the duty to advance defense costs and concludes that Clause 5 of the D&O Coverage Section expressly disavows a duty to defend and allows National Union to withhold advance payment of defense costs if such costs are not covered under the Policy. National Union expressly disclaimed any general duty to defend by stating that "[t]he **Insurer** does not assume any duty to defend." (Policy at 33.) The third paragraph of Clause 5, obligating the Insurer to advance defense costs may, at first glance, appear to impose an absolute duty to advance defense costs, but this obligation is conditioned in the fourth paragraph on National Union's consent. (*Id.* ("Only those . . . **Defense Costs** which have been consented to by the **Insurer** shall be recoverable as **Loss** under the terms of this Policy.").) National Union cannot unreasonably withhold its consent, but National Union may withhold consent if a "**[l]oss is not covered under the terms of this policy**." (*Id.* at 33-34.)

The Court "must look at [an insurance] contract as a whole, [and] consider all relevant portions together." *R.T. Vanderbilt Co., Inc.*, 273 Conn. at 462 (citation omitted). Here, since the parties' policy expressly states that National Union does not "assume the duty to defend" and conditions the advance of defense costs on National Union's consent, (Policy at 33), the Court will assess, consistent with the Policy, whether a loss is a covered loss under the Policy, not "the reasonable potential for coverage" standard applied in Brown, 399 F. Supp. 2d at

246, or the "basic scope of coverage" standard applied in Peterson, 2012 WL 5316352, at *10, both of which are inapplicable to the policy language in this case.[7]

CMEEC's reliance, in its briefs and at oral argument, on *Nash Street, LLC*, 337 Conn. 1 (2020), analyzing the duty to defend, is misplaced as *Nash* does not address the duty to advance defense costs. *See id.* at 10.

## B. Coverage for Losses Related to the Subpoenas

The parties dispute whether the Policy covers CMEEC's costs for responding to the October 2016 and March 2017 grand jury subpoenas. CMEEC seeks coverage for losses it incurred directly under "Coverage C: Organization Entity Coverage." (Policy at 29.) Coverage C provides that the National Union "shall pay on behalf of the **Organization Loss** arising from a **Claim** made against the **Organization** . . . for any actual or alleged **Wrongful Act** of the **Organization**." (*Id.*) CMEEC, as the insured, bears the burden of showing that the costs related to the subpoena are covered under the D&O Policy. *See Harleysville Worcester Ins. Co. v. Paramount Concrete, Inc.*, 10 F. Supp. 3d 252, 260 (D. Conn. 2014) ("The insured bears the burden of establishing coverage. Once an insured produces evidence of a covered loss, the burden ordinarily shifts to the insurance company to prove that an exclusion applies to limit

---

[7] While *Brown* considered similar policy language, it adopted the "reasonable potential for coverage standard" at the request of National Union to "better accommodate[]" the promise to advance defense costs in one paragraph and the limitation of the defense costs to National Union's consent in the next paragraph. *See* 339 F. Supp. 2d at 346. Here, National Union is not advancing a "reasonable potential for coverage" standard, but rather, states it has only a duty to advance defense costs when a claim is covered under the policy. (*See* Def.'s Opp'n at 18.) To give a similar effect to National Union's consent provision under the policy where National Union is not advocating for a "reasonable potential" standard, and to acknowledge the disclaimer of the duty to defend, the Court concludes that CMEEC must demonstrate that its claim is covered under the Policy. Moreover, the Court is not adopting the "basic scope of coverage" standard applied in *Peterson* which was based on California precedent, *see* 2011 WL 5316352, at *10 (quoting *Jeff Tracy*, 636 F. Supp. 2d at 1004), as this Court is basing its decision in Connecticut precedent that the "duty to defend derives from the insurer's insurance contract with the insured." *Hartford Cas. Ins. Co.*, 274 Conn. at 467 (citation omitted).

or bar coverage." (internal citations omitted)). Thus, CMEEC must demonstrate that the subpoenas were "Claim[s]" for a "Wrongful Act of the Organization."

To establish coverage, CMEEC must demonstrate that the grand jury subpoena was a "Claim." (Policy at 29.) The Definitions section of the D&O Coverage section defines "Claim" as:

(1) a written demand for monetary, non-monetary or injunctive *relief* (including any request to toll or waive any statute of limitations); or

(2) a civil, criminal, regulatory or administrative proceeding for monetary, non-monetary or injunctive relief which is commenced by:

(i) service of a complaint or similar pleading;

(ii) return of an indictment, information or similar document (in the case of a criminal proceeding); or

(iii) receipt or filing of a notice of charges.

(*Id.* at 30 (emphasis added).)

Connecticut courts have not addressed if a subpoena constitutes a demand for nonmonetary relief. Generally, "relief" is defined as [t]he redress or benefit, esp[ecially] equitable in nature (such as an injunction or specific performance), that a party asks of a court.—Also termed remedy." *Relief*, BLACK'S LAW DICTIONARY (8th ed. 2004). When considering similar contract language, courts in other jurisdictions have diverged on whether a subpoena amounts to a demand for relief. For example, the Southern District of New York, applying New York law, determined that a grand jury subpoena was not a written demand for relief, as, "in the context of a D&O policy, 'the "plain meaning" of "relief" would fairly seem to be the meaning pertinent to such legal matters.'" *Diamond Glass Cos. v. Twin City Fire Insurance Co.*, No. 06-CV-13105 (BSJ), 2008 WL 4613170, at *4 (S.D.N.Y. Aug. 18, 2008). The Northern District of Illinois in *Minuteman International v. Great American Insurance Co.*, No. 03-CV-6067 (WTH), 2004 WL 603482 (N.D. Ill. Mar. 22, 2004), however, reasoned that a "Claim" was not limited to a lawsuit, noting that "[i]f plaintiff . . . had failed to comply with the

subpoenas, the SEC could have brought suit in court to require compliance with the subpoena" and "[t]he 'relief' that could have been granted in such a proceeding would have been requiring plaintiff and/or its employees to produce documents and/or appear for a deposition." *Id.* at *7.

Whether a grand jury subpoena generally constitutes a "Claim," here it is not covered by the parties' policy as it is not a "Claim . . . for any actual or alleged Wrongful Act." (Policy at 29.) The D&O Coverage Definitions subsection states that, "with respect to the Organization under Coverage C [Organization Entity Coverage]," a "Wrongful Act" is "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by or on behalf of the **Organization**." (*Id.* at 31.)

Courts have found the presence or absence of language requiring a nexus to a wrongful act instructive in determining whether a subpoena was covered as a "Claim." The Southern District of New York found that a SEC subpoena was a "Claim" where the parties could have excluded the SEC subpoena from the definition of "Claim" by limiting a "Claim" to "demands for non-monetary relief that allege a 'Wrongful Act.'" *Patriarch Partners, LLC v. AXIS Insurance Co*., No. 16-CV-2277 (VEC), 2017 WL 4233078, at *5 (S.D.N.Y. Sept. 22, 2017). The Sixth Circuit noted that an FTC subpoena was not a covered claim, in part because the subpoena was not "relief . . . for a Wrongful Act." *Employers' Fire Ins. Co. v. ProMedica Health Sys., Inc.*, 524 F. App'x. 241, 252 (6th Cir. 2013). Similarly, the Eleventh Circuit reasoned that investigative requests sent by the SEC were not covered claims, as "the SEC had not alleged a 'wrongful act,' nor had it targeted a specific insured person." *MusclePharm Corp. v. Liberty Ins. Underwriters, Inc.*, 712 F. App'x 745, 753 (11th Cir. 2017).

Here, the 2016 and 2017 grand jury subpoenas do not "allege a Wrongful Act." An "allegation" is "[t]he act of declaring something to be true" or "[s]omething declared or asserted as a matter of fact. *Allegation*, BLACK'S LAW DICTIONARY (8th ed. 2004). The grand jury subpoenas do not "assert" or "declare" that a wrongful act has occurred, but rather

demanded documents as part of an "investigation into the *possible commission* of a felony." (Ex. B:2-3, Pl.'s Mot. for Summ. J. [Doc. # 61-3] at 18, 25 (emphasis added).); *see Employers' Fire Ins. Co.*, 524 F. App'x at 247 (noting that an FTC subpoena "only indicated that the FTC sought to determine 'whether' such violations had occurred or would occur").

Further, investigation into "the possible commission of a felony" was not an allegation of a wrongful act by CMEEC. CMEEC argues that "an organization can only act through its agents or employees, (Pl.'s Mem. at 27 n.14), and stresses that "[t]he Policy does not require CMEEC to be a target of the grand jury investigation for the subpoenas to be a Claim for a Wrongful Act," (Pl.'s Opp'n at 38). But this interpretation ignores the structure of the parties' Policy. The Policy defines the term "Wrongful Act" separately "with respect to the **Individual Insureds**" and "with respect to the **Organization** under Coverage C." (Policy at 31.) An individual insured is covered when the individual commits a wrongful act "in his/her respective capacities," while a wrongful act of the organization must be committed "by or on behalf of the Organization." (*Id.*) The definition of a wrongful act of an organization is also specifically tied to Coverage C, the provision at issue. (*See id.*)

Neither the 2016 Subpoena nor the 2017 Subpoena indicated that the Government was pursuing a theory of criminal liability against CMEEC as an organization. CMEEC does not offer any evidence suggesting that it received a target letter from the Government or any other communication that CMEEC faced potential criminal liability as an organization. Rather, CMEEC acknowledged in its brief and at oral argument that "no one outside of the grand jury investigation knew the identity of any target of the investigation at the time the subpoenas were issued." (Pl.'s Opp'n at 38.)

Accordingly, the losses incurred by CMEEC relating to the grand jury subpoenas fall outside of the D&O Coverage Section, as they do not relate to a wrongful act or a wrongful

act on behalf of CMEEC.[8] Thus, the Court grants National Union's Motion for Summary Judgment and denies CMEEC's Motion for Partial Summary Judgment on the issue of whether the losses relating to the 2016 and 2017 Subpoenas are covered by the Policy.

### C.  Commissions Exclusion

National Union asserts that the Policy's Commissions Exclusion excludes coverage for all of the alleged losses in this case. (Mem. of Law in Supp. Of Def. Nat'l Union's Mot. For Summ. J. ("Def.'s Mem.") [Doc. # 80] at 14.) Under Connecticut law, National Union, as the insurer, bears the burden of establishing that the Commissions Exclusion applies. *Nationwide Mut. Ins. Co. v. Pasiak*, 327 Conn. 225, 239 (2017). Policy exclusions are "strictly construed in favor of the insured" unless a court "has a high degree of certainty that the policy language clearly and unambiguously excludes the claim." *Conn. Ins. Guar. Ass'n v. Drown*, 314 Conn. 161, 188 (2014). But "the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Id.*

The Commissions Exclusion states,

> In consideration of the premium charged, it is hereby understood and agreed that, with respect to all Coverage Sections, the **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon, or attributable to:
>
> (i) payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time domestic or foreign government or armed services officials, agents, representatives, employees or any members of their family or any entity with which they are affiliated; or
>
> (ii) payments, commissions, gratuities, benefits or any other favors to or for the benefit of any full or part-time officials, directors, agents, partners, representatives, principal shareholders, or owners or employees or "affiliates" (as that term is defined in The Securities Exchange Act of 1934, including any officers, directors, agents, owners, partners, representatives, principal

---

[8] As the Court does not find the language of the Policy ambiguous in this respect, it does not consider the parol evidence, such as the ethics complaints, offered by CMEEC on this issue.

shareholders or employees of such affiliates) of any customers of the **Organization** or any members of their family or any entity with which they are affiliated; or

(iii) political contributions, whether domestic or foreign.

(Policy at 70.)

The parties agree that CMEEC is a political subdivision of the State of Connecticut and the indicted individuals were all directors or officers of CMEEC during the alleged criminal acts. (Def.'s R. 56(a) Stmt. ¶¶ 3, 46.) According to National Union, because the directors and officers of CMEEC are government officials, and because the subpoenas, indictments, and Pryor lawsuit involve "payments, benefits or favors," National Union is not obligated to "make any payment" to CMEEC. (*See* Policy at 70; Mem. of Law in Supp. Of Def. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa's Mot. for Summ. J. [Doc. # 78-1] at 20.) National Union highlights that the Connecticut Supreme Court has interpreted the phrase "'arising out of' in the context of insurance policies" as requiring an insurer "to show only that the accident or injury 'was connected with,' 'had its origin in,' 'grew out of,' 'flowed from,' or 'was incident to' the [specified subject]." *Pasiak*, 327 Conn. at 244 (quoting *Hogle v. Hogle*, 167 Conn. 573, 577 (1975)); (*see* Def.'s Mem. at 21.)

CMEEC argues that the Commissions Exclusion is ambiguous,[9] because the Exclusion is "untethered to any particular payor" and could "reasonably be construed as to not apply to claims arising from allegations . . . that a government official improperly caused his agency to make payments to him." (Pl.'s Mem. at 34-35.) As such, CMEEC argues, "[p]ayment to some other person or entity, outside [CMEEC], is reasonably implied." (Pl.'s Opp'n at 28.)

---

[9] National Union argues that, as CMEEC's Complaint does not allege that the contract is ambiguous, it is using "motion practice to amend its pleading to allege ambiguity." (Def.'s Opp'n at 28.) But "whether a contract is ambiguous is a question of law for the court." *Enviro Express, Inc. v. AIU Ins. Co.*, 279 Conn. 194, 200 (2006).

The Connecticut Supreme Court instructs that "[l]anguage in an insurance contract . . . must be construed in the circumstances of a particular case, and *cannot be found to be ambiguous or unambiguous in the abstract.*" *Lexington Ins. Co.*, 311 Conn. at 32 (internal citations, brackets, and quotation marks omitted). When read in the abstract, the language of the Commissions Exclusion could exclude claims arising out of any payments or benefits to any government official. But in the context of the remainder of the Policy and the particular facts of this case, the Commissions Exclusion, read from a layperson's perspective, is ambiguous as to the applicability of internal payments or favors benefitting CMEEC's own directors and employees.[10]

The Policy's D&O Coverage Section obligates National Union, with certain exceptions, to pay for losses arising out of claims "for any actual or alleged Wrongful Act of [an] Individual Insured," and Wrongful Acts may include "any breach of duty, neglect, error, misstatement, misleading statement, omission or act." (Policy at 3, 29.) National Union's proffered interpretation of the Commissions Exclusion would transform the D&O Coverage Section, such that the Section covers only wrongful acts of CMEEC's directors and employees that do not involve "payments, commissions, gratuities, benefits, or any other favors" to these same individuals. (*Id.* at 70.) The reasonable expectation of Policy coverage would be dramatically reshaped by National Union's interpretation. At oral argument, Defendant asserted that the Commissions Exclusion concerns any payments received by government officials, regardless of the payor, and would even encompass a government official, such as a CMEEC officer, embezzling money for him or herself. But it is far from clear that a layperson would construe the Commissions Exclusion to preclude coverage for losses from any

---

[10] National Union's observation that three of the Board members were government employees in two capacities as Sullivan was a member of Norwich Public Utilities, Bilda was a manager of Norwich Public Utilities, and DeMuzzio was a member of the Groton Utilities Commission does not resolve this ambiguity as these individuals were still officers and directors of CMEEC and individual insureds under the Policy. (Def.'s Mem. in Opp'n at 26-27.)

payment, benefit, or favor made and received by the insured's officials, just because of their status as a government official. *See R.T. Vanderbilt Co., Inc.*, 273 Conn at 462-63 ("It is a basic principle of insurance law that the language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters.").

CMEEC offers parol evidence to support its position that the Commissions Exclusion does not apply to benefits or favors by and to CMEEC's own officers and directors. Connecticut law permits the court to consider "parol evidence, that is, evidence outside the four corners of the contract concerning matters governed by an integrated contract," if such evidence is legally relevant. *Schilberg Integrated Metals Corp.*, 263 Conn. at 277. Parol evidence that helps "explain an ambiguity appearing in the instrument" is legally relevant. *Id.* In contrast, parol evidence that a party "offer[s] solely to vary or contract the written terms of an integrated contract is . . . legally irrelevant." *Id.*

CMEEC offers a deposition from a National Union underwriter, describing that National Union required insured organizations to complete a Foreign Corrupt Practices Act ("FCPA") Questionnaire before National Union would reach a decision as to whether the Commission Exclusion could be removed from the Policy.[11] (Pl.'s Mem at 32-33). The FCPA prohibits individuals from making payments to foreign officials "for purposes of influencing any act or decision of such foreign official in his official capacity." *Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber*, 327 F.3d 173, 180 (2d Cir. 2003) (explaining the six elements of the FCPA). CMEEC asserts that this shows that the Commissions Exclusion involves the FCPA and "relates to bribery." (*Id.*); *see also* Jason E. Prince, *A Rose By Any Other Name? Foreign Corrupt Practices*

---

[11] CMEEC also offers evidence that National Union did not resort to the Commissions Exclusion when National Union made payments under the "Crisisfund Coverage" section of the Policy. But considering that the Commissions Exclusion relates to "Claims," and a Crisis Management Event under the Crisisfund Coverage Section is not a "Claim," (*see* Policy at 50, 70), this evidence is not relevant to the meaning of this exclusion.

*Act-Inspired Civil Actions*, THE ADVOCATE (IDAHO), March-Apr. 2009, at 20, 23 ("[M]any directors and officers insurance policies ("D&O policies") contain a "commissions exclusion" (created shortly after the FCPA's enactment) that excludes coverage for losses arising from payments to foreign officials.").

The Court considers this relevant parol evidence as it may help explain the intent of the Exclusion, or at least, confirms its ambiguity. The evidence indicating that there is a connection between the FCPA and the Commissions Exclusion may reflect an intent to exclude crimes of bribery which involve an external party. *Cf. United States v. Kozeny*, 493 F. Supp. 2d 693, 703 (S.D.N.Y. 2007) (quoting *In re Grand Jury Subpoena*, 218 F. Supp. 2d 544, 550 (S.D.N.Y. 2002) ("The FCPA makes it illegal to bribe foreign government officials . . ."); *United States v. Esperdy*, 285 F.2d 341, 342 (2d Cir. 1961) ("Bribery in essence is an attempt to influence another . . .").

"As a matter of law, summary judgment is inappropriate when the language of a contract as to the parties' intent is ambiguous." *O, R & L Commercial*, 156 Conn. App. 371, 381 (2015). However, under the doctrine of contra proferentem, ambiguous language in an insurance contract is construed in favor of the insured. *Conn. Ins. Guar. Ass'n v. Fontaine*, 278 Conn. 779, 788-89 (2006) ("Indeed, our interpretation of ambiguous policy language in favor of coverage under the doctrine of contra proferentem has become near axiomatic in insurance coverage disputes."). Because the Court concludes the policy exclusion language here is ambiguous, the doctrine of contra proferentem applies, and the Exclusion must be construed in favor of CMEEC. *See Israel v. State Farm Mut. Auto. Ins. Co.,* 259 Conn. 503, 521 (2002); *Israel v. State Farm Mut. Auto. Ins. Co.*, 293 F.3d 595, 600 (2d Cir. 2002) (applying the doctrine of contra proferentem to a summary judgment motion which was initially rendered in favor of the insurer, appealed, certified to the Connecticut Supreme Court, reversed, and remanded). Furthermore, a Policy Exclusion only applies if a court "has a high degree of certainty that the policy language clearly and unambiguously excludes the claim," and as the

language of the exclusion here is ambiguous, the Court has no basis for concluding that the Commissions Exclusion unambiguously precludes CMEEC's claim. *Conn. Ins. Guar. Ass'n*, 314 Conn. at 188.

Accordingly, National Union's Motion for Summary Judgment is denied as to this issue. CMEEC's Motion for Summary Judgment is granted in part and denied in part. Its request that the Court "reject National Union's resort to Endorsement 8 [the Commissions Exclusion] as a matter of law," is granted. The Court is not "enter[ing] a judgment of liability on CMEEC's claim for breach of contract," as the Court has determined that the duty to defend is inapplicable, and CMEEC must now demonstrate at trial that its Claims are covered under the Policy.

## IV. Motions to Preclude

In addition to the cross motions for summary judgment, each party has also moved the preclude the testimony of its adversary's proffered expert on the issued reasonableness of the fees submitted for reimbursement by CMEEC—the amount of damages CMEEC seeks to recover on its breach of contract claims.

The discretion of this Court to admit expert testimony is governed principally by Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; *Nimely v. City of N.Y.,* 414 F.3d 381, 395 (2d Cir. 2005). The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), made clear that Rule 702 charges district courts with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id*. at 597; *see also Nimely,* 414 F.3d at 396.

If an expert is qualified, a court assesses the reliability of the proposed testimony, according to the factors listed in Rule 702, as well as "those enumerated in *Daubert*, some or all of which might prove helpful in determining the reliability of a particular scientific theory or technique." *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 233 (2d Cir. 2021) (citation and quotation marks omitted). These factors are:

> (1) whether the methodology or theory has been or can be tested; (2) whether the methodology or theory has been subjected to peer review and publication; (3) the methodology's error rate; and (4) whether the methodology or technique has gained general acceptance in the relevant scientific community.

*Id.* (citing *Daubert*, 509 U.S. at 593-94).

If a court determines that an expert is qualified and that the expert's testimony is reliable, "Rule 702 requires the district court to make a third inquiry: whether the expert's testimony (as to a particular matter) will 'assist the trier of fact.'" *Nimely*, 414 F.3d at 397 (quoting Fed. R. Evid. 702). The Second Circuit "ha[s] consistently held, in that respect, that expert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it" should be excluded, because such testimony "undertakes to tell the jury what result to reach" and "attempts to substitute the expert's judgment for the jury's." *Id.* (citations omitted). Similarly, "[i]t is a well-established rule in th[e Second] Circuit that experts are not permitted to present testimony in the form of legal conclusions." *Densberger v. United Techs. Corp.*, 297 F.3d 66, 74 (2d Cir. 2002) (citation omitted). Accordingly, "[a] district court properly rejects an expert's testimony when the testimony . . . inappropriately draws legal conclusions." *Sparta Commercial Servs., Inc. v. DZ Bank*, 680 F. App'x 17, 19-20 (2d Cir. 2017) (citations omitted).

Expert testimony must also pass muster under Rule 403, and "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the [finder of fact]." Fed. R. Evid. 403. But, as here, in a "bench trial,

where 'there is no possibility of prejudice, and no need to protect the fact finder from being overawed by "expert" analysis,'" *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 502 (S.D.N.Y. 2013) (quoting *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 07 Civ. 5804, 2009 WL 959775, at *8 n. 4 (S.D.N.Y. Apr. 8, 2009)), a court should only exclude evidence if there are "serious flaws in reasoning or methodology." *Id.* (quoting *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009)); *see also Law Debenture Trust Co. of N.Y. v. WMC Mortgage, LLC*, No. 3:12-cv-1538 (CSH), 2015 WL 9581729, at *5-6 (D. Conn. Dec. 30, 2015).

### A. National Union's Expert, David Paige

CMEEC moves to preclude expert testimony of David Paige ("Paige") offered by National Union. (*See* Pl.'s Mot. to Preclude.) Paige is the founder and managing director of a business "dedicated to the provision of expert testimony [relating to attorneys' fees, expenses, and costs] and to making sure that clients only pay fair, ethical legal fees." (Ex. A., Def.'s Opp'n to Mot. to Preclude Expert Testimony of Def.'s Expert David Paige [Doc. # 93-1] at 2.) He is admitted to practice law in New York, is affiliated with the New York City Bar Association's Committee on Professional Responsibility, has published a variety of materials regarding legal fees, and has testified as an expert in state and federal courts. (*Id.* at 2, 6.)

Paige's expert report analyzes the attorneys' fees and costs paid by CMEEC to the firms that represent CMEEC and its individual directors and officers. (*See* Ex. B, Pl.'s Mot. to Exclude ("Paige Report") [Doc. # 81-3].) To compile this report, Paige generally consulted the subpoenas and indictments from the related criminal cases, invoices from the various law firms, documents from the Pryor civil action, reports analyzing attorneys' hourly rates published by the Wolters Kluwer company, materials from CMEEC's proffered expert, court decisions, and "Commercial Billing Guidelines." (*Id.* at 9.) Paige opines that "the large number of generally objectionable billing practices identified in the Analyzed Bills, combined with the unreasonably high rates, necessitates a series of across-the-board reductions to account

29

for these issues." (*Id.* at 37.) Paige also states that, "based on common commercial standards, my experience and consistent legal precedent, it is my opinion that CMEEC has not met its burden to prove the requested Total Fees and Expenses are reasonable." (*Id.*) Ultimately, Paige's Report recommends a fifty-two percent reduction in the total amount of fees and expenses sought by CMEEC. (*Id.* at 38.)

While Paige is not licensed to practice in Connecticut and has not represented a client in a white-collar crime case, Paige's occupation and professional experiences qualify him to testify as an expert about proper law firm billing practices. Certain aspects of his testimony, however, will be excluded, due to the form of his opinions and the unreliability of his methods.

Plaintiff argues that Paige's conclusions that the disputed fees were "reasonable" or "unreasonable" includes legal conclusions that impermissibly invade the province of the trier of fact. *See United States v. Bilzerian*, 936 F.2d 1285, 1294 (2d Cir. 1991). However, at oral argument, Plaintiff's counsel acknowledged that the determination of fees as "reasonable and necessary" may be a conclusion of both fact and law. It is acknowledged that "[e]xperts may testify on questions of fact as well as mixed questions of fact and law." *Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993). Paige, however, makes conclusions of law that instruct the trier of fact on the law. (*E.g.*, Paige Report at 15) ("I am of the opinion that CMEEC has not met its burden to prove whether the fees sought were reasonable and therefore recommend that such fees be excluded from the Total Fees sought by CMEEC.") The Report includes assertions and characterizations of legal standards applicable to fee disputes, (*see e.g.*, Paige Report at 4, 15), discusses what "courts have held" in other cases, (*see e.g.*, *id.* at 7, 13, 15), and concludes what aspects of the fees are "reasonable" or "unreasonable" based upon legal standards, (*see, e.g.*, *id.* 15, 22, 38). The reliability of these conclusions is also called into question. Paige uses a fee-shifting standard to assess whether the attorneys' fees are reasonable, while this is a case involving potential damages for breach

of contract. In this context, there is some support for a presumption of reasonableness for the fees that a client pays. *See Wells Fargo Bank, NA v. Konover*, No. 3:05CV1924(AWT), 2014 WL 3908596 at *5-14 (D. Conn Aug. 8, 2014).

"It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions." *Densberger*, 297 F.3d at 74. As such, Paige's testimony cannot take the form of improperly proffered legal conclusions. Paige's subjective conclusion that certain fees should be reduced by fifty percent is unreliable and should be excluded. In his deposition, when asked why a fifty percent reduction should made to partially redacted fee entries, he stated that he subjectively "thought it was fair." (Ex. E, Pl.'s Mot. To Exclude ("Paige Dep.") [Doc. # 81-6] at 179:1-7.) When asked the same about a fifty percent reduction to total expenses, he stated the same. (*Id.* at 206:8-16.) This demonstrates "serious flaws" in Paige's methodology or no methodology at all. *See Assured Guar. Mun. Corp.*, 920 F. Supp. 2d at 502; *see also Zee Co. v. Williams, Mullen Clark & Dobbins, P.C.*, 547 F. App'x 166, 173 (4th Cir. 2013) (stating the trial court did not abuse its discretion by excluding Paige in part because Paige's conclusion that fees should be reduced by 75% was a "speculative opinion as to the ultimate issue").

Plaintiff argues that Paige's testimony should be excluded under Rule 702 and 403 of the Federal Rules of Evidence. (Pl.'s Mot. To Exclude at 25.) Paige's Report, however, contains several topics on which his testimony would be competent, reliable, helpful, and not unduly prejudicial. Paige's testimony on prevailing market rates, "excessive staffing," "excessive legal research," "internal conferences and coordination, joint defense counsel conferences," "overqualified staff," "block billing," "vague or inadequately described time entries," "pattern entries," "administrative and/or clerical tasks," and "pure travel" could help a trier of fact determine the nature or necessity of various rates and charges. Paige's extensive experience reviewing invoices for legal fees through his business qualify him to offer testimony on these topics, and the "Tagging Guide" he provided in connection with his Report reflects a

31

sufficiently replicable methodology that renders his opinions reliable. (*See* Ex. D., Pl.'s Mot. to Exclude [Doc. # 81-5].) CMEEC may address the flaws it sees with Paige's opinions during cross-examination.[12]

CMEEC's argument that Paige's opinions are irrelevant, unreliable, and do not relate to the damages at issue in this case lacks merit. Even if CMEEC's attorneys' fees are presumed reasonable, National Union is entitled to the opportunity to overcome the presumption of reasonableness, *see Konover*, 2014 WL 3908596 at *7, and Paige's testimony could assist the trier of fact in that assessment. Further, CMEEC's reliance on *Zee Company, Inc. v. Williams, Mullen Clark & Dobbins, P.C.*, 547 Fed. App'x 166, 173 (4th Cir. 2013) to argue that deficiencies in the billing process are not relevant to a reasonableness conclusion is based on inapplicable North Carolina caselaw.

As such, the Court grants in part and denies in part CMEEC's Motion to Preclude Expert Testimony. The Motion to Preclude is granted in terms of Paige's proffered legal conclusions of reasonableness *vel non* and subjective percentage reduction in fees. The Motion is denied as to the other aspects of his testimony.

### B.  CMEEC's Expert, James Bergenn

National Union moves to preclude expert testimony of James Bergenn ("Bergenn") offered by CMEEC. (*See* Def.'s Mot. to Preclude.) Bergenn is an attorney with "over 40 years [of experience] handling and observing investigations and litigation in white collar criminal cases." (Ex. A., Def.'s Mot. to Preclude ("Bergenn Report") [Doc. # 87-2] at 3.) In his Report, Bergenn describes the ethical duties imposed on defense counsel in criminal matters, as well as details on how federal criminal defense practice is conducted in complex, multi-defendant cases. (*Id.* at 3-5.) Bergenn also states that, "[i]n the case at hand, each of the attorneys who

---

[12] "Particularly in a bench trial, '[v]igorous cross-examination, presentation of contrary evidence, and careful … [attention to] the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Assured Guar. Mun. Corp.*, 920 F. Supp. 2d at 502 (quoting *Daubert*, 509 U.S. at 596).

invoiced legal services rendered to CMEEC or to the indicted defendants possessed the level of experience required to perform the reasonable and necessary work the case demands," and that "[t]hese attorneys have earned reputations for meeting personal standards that befit the stakes in this case." (*Id.* at 7.) Ultimately, Bergenn's Report concludes that his "review of the federal criminal defense attorneys' invoices provided, taking into account the experience and the standards described above, does not reveal any instances where CMEEC or an individual criminal defendant was billed for unnecessary or unreasonable work." (*Id.* at 9.)

National Union argues that all four of the *Daubert* Factors weigh in favor of precluding Bergenn's testimony. (Def.'s Mot. to Preclude at 13.) It contends that Bergenn does not have any specialized knowledge; Bergenn does not base his opinion on data, as CMEEC's invoices were "block billed," "vague," or "redacted"; Bergenn does not base his opinion on reliable principles and methods, as his opinion is centered upon "how high the stakes are in federal criminal matters"; and Bergenn does not use a methodology, as he rests his opinion on the reasonableness of attorneys' fees on the "best practices" of federal criminal defense attorneys. (*Id.* at 13-17.) CMEEC opposes, arguing that Bergenn's opinion meets the demands of the Federal Rules of Evidence. (Pl.'s Opp. to Mot. to Preclude the Expert Testimony of Pl.'s Expert James Bergenn [Doc. # 96] at 20.)

While Bergenn certainly could be qualified as an expert by his knowledge, skill, and experience in the field of white-collar defense, there is no indication from his expert report or deposition testimony that his "testimony is the product of reliable principles and methods," or that he "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(c), (d). An expert may testify based on his or her experience alone, *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003), but when an expert witness relies "solely or primarily on experience, then the witness must explain how that experience leads to the

conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts," Fed. R. Evid. 702 (advisory committee's notes).

Here, it appears that Bergenn reviewed the invoices in connection with the materials filed in the criminal proceedings involving CMEEC and its directors and officers, and then exercised his own judgment—informed by his professional experiences—as to the necessity and reasonableness of the fees. (*See* Bergenn Report at 8-9.; Ex. B, Def.'s Mot. to Preclude [Doc. 87-3] at 32:2-38:25.) Bergenn identifies that attorneys litigating federal criminal defense cases are subject to "best practices" but does not explain how CMEEC's attorneys engaged in these types of best practices, beyond a conclusory comparison to five cases from Bergenn's own experience. (Bergenn Report at 7-9.) Rule 702 demands more than the exercise of an expert's subjective judgment for his or her testimony to be "reliable" under the Federal Rules, including an explanation of how the expert's subjective judgment is applied to the facts.

National Union also contends that Bergenn started with the assumption that the attorneys' fees are reasonable and worked backwards to support his conclusion. (Def.'s Mot. to Preclude at 8-9.) CMEEC counters, stating that even if Bergenn started with this presumption of reasonableness, it is "permitted by law" as courts have applied a presumption of reasonableness to attorneys' fees in similar cases. (Pl.'s Opp. to Mot. to Preclude at 11.) However, Bergenn's expert report and deposition do not mention this presumption and Bergenn's testimony is still required to be reliable under the Federal Rules of Evidence. Further, there are instances in where Bergenn indicates that he worked backwards from the assumption that the fees were reasonable. For example, when asked how he determined that a redacted time entry was reasonable, he stated that while he did not know what specifically the attorney was researching, he could "hazard a pretty good opinion" and he "certainly ha[d] no reason to think what he is doing then for those hours [was] unreasonable and unnecessary based on that." (Ex. B, Def.'s Mot. to Preclude [Doc. 87-

3] at 98:20-99:15.) As such, this presumption applied after his review was already complete does not create reliability in his methods.

The Court recognizes that attorneys' fees may be redacted for confidentiality purposes. *See Konover*, 2014 WL 3908596, at *12-13. CMEEC has records that contain both fully and partially redacted entries and entries that are block-billed. (Def.'s Mot. to Preclude at 6.) At oral argument, CMEEC noted that Bergenn determined these entries were reasonable by reviewing the docket and the documents to understand the issues. (*See also* Ex. A, Pl.'s Opp. to Mot. to Preclude [Doc. 96-1] at 95:2-98:11.) This "methodology" is unpersuasive and is not sufficiently reliable to assist the trier of fact but rather demonstrates his unsubstantiated assumption of reasonableness such that his testimony should be excluded.

As Rule 702 requires that an expert's testimony be "the product of reliable principles and methods," and the application of such principles and methods, *see* Fed. R. Evid. 702(c), (d), and as Bergenn's testimony has not been shown to be either, the Court grants National Union's Motion to Preclude Expert Testimony of Plaintiff's Expert James Bergenn.

## V.  Conclusion

For the foregoing reasons, to Court enters the following orders:

- CMEEC's Motion for Partial Summary Judgment [Doc. # 61] is granted as to the inapplicability of the ambiguous Commission Exclusion and denied as to the request for summary judgment on the remaining counts in its Complaint.

- National Union's Motion for Summary Judgment [Doc. # 78] is denied as to the applicability of the Commissions Exclusion and granted as to whether losses associated with responding to the 2016 Subpoena and the 2017 Subpoena fall within the scope of the D&O Coverage Section.

- CMEEC's Motion to Preclude Testimony of Defendant's Proposed Expert David Paige [Doc. # 81] is granted in part and denied in part. Paige's testimony is limited to the issues identified in this Ruling, and he cannot present his opinions of whether invoices paid are subject to a percentage reduction as unreasonable.

- National Union's Motion to Preclude Plaintiff's Expert James Bergenn [Docs. ## 85, 87] is granted.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 14 day of September 2021